**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

BLAKE NIESWAND,

                Plaintiff,                    CASE NO. 07-CV-10541

-vs-                                    PAUL D. BORMAN
                                          UNITED STATES DISTRICT JUDGE

CHARLES MILNE, et al.,

                Defendants.
_____/

**OPINION AND ORDER**
**GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Before the Court are the following motions: (1) Defendant Charles Milne's January 18,

2008 Motion for Summary Judgment (Doc. No. 27); (2) Defendant Cox, Hodgman & Giamarco

P.C.'s ("CHG") January 28, 2008 Motion for Summary Judgment (Doc. No. 29); (3) Plaintiff

Blake Nieswand's ("Plaintiff") January 31, 2008 Motion for Summary Judgment (Doc. No. 31);

and (4) Milne's March 4, 2008 Motion to Strike Affidavit of Gerald Gordinier and Motion to Bar

Him from Testifying as Plaintiff's Expert at Trial (Doc. No. 38). The parties filed the appropriate

Responses. The Court held a motion hearing on May 14, 2008. Having considered the entire

record, and for the reasons that follow, the Court GRANTS Milne's motion for summary

judgment, GRANTS CHG's motion for summary judgment, DENIES Plaintiff's motion for

summary judgment, and DENIES AS MOOT Milne's motion to strike.

**I.      BACKGROUND**

This diversity case arises from Plaintiff's allegations that Milne committed legal

malpractice in connection with Plaintiff's bankruptcy case. Plaintiff also alleges that Milne's

former firm CHG should be held vicariously liable for Milne's actions.

For thirteen years, Plaintiff owned a business called "Metro Data," that provided computer service and sales. (Def. CHG Br. Ex. 9, Nieswand Dep. 22). By early 2004, the business was floundering; and Plaintiff sought advice of counsel at CHG. (*Id*. at 27). Compounding Plaintiff's problems, Michele, his wife of sixteen years, discovered, on Christmas Eve 2004, while the couple was at her parents' house in Connecticut, that Plaintiff had been having a year-long affair with a waitress in Florida named Jill Fox. (*Id*. at 13-14). That same day, December 24, 2004, Michele kicked Plaintiff out of her parents' house in Connecticut; and Plaintiff then moved shortly thereafter to Florida into one of the condominiums that he and his wife owned. (*Id*. at 7-8, 34).

At the time, Plaintiff and his wife owned a house in Clarkston, Michigan, and three condominiums in Florida used to generate rental revenue. (*Id*. at 33-34). By the end of 2004, these properties were held as tenancies by the entirety and worth approximately $1.6 million, with about $735,000 in equity. (Def. Milne Br. Ex. C, Bankruptcy Schedule). In terms of personal (non-business) debt, Plaintiff owed $490,000 to National City Bank on a personal guaranty, and approximately $122,000 in personal credit card debt. (Def. Milne Br. Ex. D, Amended Bankruptcy Schedules).

In the meantime, Plaintiff's wife filed a divorce action in Oakland County Circuit Court. Plaintiff was served while in Florida, and hired a Michigan-based attorney named Gerald A. Gordinier to represent him in the divorce proceedings. (Nieswand Dep. 36). Gordinier testified that the strategy in the divorce action would be to admit fault, and to seek a 55% to 45% distribution of the marital estate in favor of Michele. (Def. Mine Br. Ex. E, Gordinier Dep. 7-8).

On February 1, 2005, the state court ordered Plaintiff to pay Michele $4,000 per month in domestic support. (Nieswand Dep. 36). That amount was later reduced to $3,000. (*Id*.). Almost from the outset, Plaintiff lacked enough income to make the $4,000 payments. (*Id*. at 37).

Plaintiff met Milne, then an employee of CHG, in 2003, through a referral from William Heritage, another associate at the firm. (Def. Milne Br. Ex. B, Milne Dep. 20). During the latter half of 2003, Milne and Plaintiff had discussions involving the winding down of Plaintiff's business and initial discussions about filing for personal bankruptcy. (*Id*. at 20-21). In late 2004 and early 2005, Plaintiff had several additional conversations with Milne about filing for personal bankruptcy.

Milne had joined CHG in March 2000. (*Id*. at 12-13). During the autumn of 2004, Milne was in the process of leaving the firm to launch his own solo practice. Although Milne received his last paycheck from the firm on November 30, 2004, the firm continued to allow him to use its office space. (*Id*. at 14-15). During January 2005, Milne was in the process of setting up his own law practice and opened his own separate client trust fund account and using his home address for correspondence. (Def. CHG Br. Ex. 5, Bank Documents). Carol Prindle, CHG's director of administration, stated that CHG allowed Milne to remain working under the firm name on a limited basis, until March 1, 2005. (Def. CHG Br. Ex. 10, Prindle Dep. 13). Milne physically moved out of the CHG office on March 11, 2005. (*Id*. at 16).

On February 2, 2005, Plaintiff sent to CHG a retainer check in the amount of $1,700 for Milne. (Def. CHG Br. Ex. 4, Check). On February 22, 2005, CHG forwarded the funds to Milne's personal client trust account. (Def. Br. Ex. 6, Check). Plaintiff informed Milne that Michele had filed for divorce. (Nieswand Dep. 55; Milne Dep. 26). According to Plaintiff, Milne

told him that the best way to "keep hopefully half protected from the creditors" was to file for personal bankruptcy under Chapter 7. (Nieswand Dep. 55). Per Plaintiff, the two also discussed filing bankruptcy in either Florida or Michigan. (*Id*. at 76). Milne denied discussing with Plaintiff the idea of establishing a homestead in Florida. (Milne Dep. 30).

On February 15, 2005, Gordinier wrote a letter to Michele's divorce counsel, Michael A. Robbins, suggesting that Michele permit a potential bankruptcy proceeding to conclude before the entry of a divorce judgment. (Def. Milne Br. Ex. I-1, Letter).

On February 24, 2005, Milne sent a letter to Plaintiff concerning the former's plan to leave CHG. (Def. CHG Br. Ex. 7, Letter). Plaintiff countersigned the letter to indicate his intent to keep Milne as his attorney. (*Id*.).

At his deposition, Milne explained his reasons for advising a Chapter 7 bankruptcy, given Plaintiff's circumstances:

> Q:    When you learned that Michele Nieswand had filed for divorce, did your advice to [Plaintiff] change?
> A:    Yes.
> Q:    How did it change?
> A:    Well, previously I had felt that we could be comfortable with this being a no-asset case, he'd be discharged in bankruptcy and not have any of the debts from the business chase him, any of the debts he incurred personally in relationship to the business adjacent, which would, I suppose, include most of his credit card debt, which would no longer be reimbursed, his home line of equity, which he told me was primarily used for the business.
>
> And it became a very great concern to me that without this he faced what would be called Hobson's Choice, where his credit, he could lose everything to his creditors outside of bankruptcy once it was no longer protected by the entirety or he could lose a great deal, if not all of it, in bankruptcy because it wasn't protected by the entirety.
>
> I told him it was my opinion that we should try and leverage a deal based on the [*In re Fordu*] case out of the Sixth Circuit, which had held that mar[it]al property divisions aren't subject to the same considerations and bankruptcy

case considerations. And I suggested that because he advised that the condominiums in Florida had been funded in many ways including funds held in some sort of commonality with his various businesses, his personal holdings, his wife, and that, therefore, they could be reached by the creditors, by the Trustee in bankruptcy under the Uniform Fraudulent Conveyances Act, and, therefore, he would have a significant amount of leverage in discussing the division of property, or as significant as the case in the Sixth Circuit dealing with Ohio would allow.

(*Id.* at 26:25, 27:1-25, 28:1-9).

Milne further explained how his strategy could benefit Plaintiff:

Q:    After [Michele] filed for divorce was there any other way besides reaching a resolution with Michele that [Plaintiff] could have preserved any amount of joint assets?

A:    Well, it grants an infinite number of combinations of negotiations and legal actions that could have been taken. But if you're assuming that she goes through with the divorce and the entirety is dissolved by that action, then his creditors are going to obtain all but the exempt assets. If you assume that you can reach some sort of resolution and they don't proceed with that and he gets to finish his bankruptcy, and the appropriate number of days passes before the bankruptcy can be reopened because he comes into assets, then there would be an ability to preserve assets for [Plaintiff]. But that would, you know, obviously, be dependent on some sort of resolution – well, probably dependent on some sort of resolution with his spouse and her attorneys before she stopped proceeding with the divorce or simply let it sit subject to the Stand Bankruptcy and allowed the time to pass.

. . . .

[Plaintiff], in my mind, could also have developed a relationship with the Trustee and was shown that much of the assets in real estate were tainted by being funded out of co-mingled assets and, therefore, subject to his business Trustee – business creditors and, therefore, he could have reached some sort of favorable resolution than he ultimately did with the Trustee.

. . . .

And I discussed this with [Plaintiff], and the possibility was to sit there and be open to his wife's efforts to take whatever share of the marital estate was appropriate and then have his creditors go after him or go into bankruptcy and try and find multiple ways to leverage his business situation to get a better outcome.

But he was, as they say, in deep trouble. He had lost his business, he owed a fortune, and his marriage, apparently, imploded with the advice that he had an affair going on December 24th, 2004, which he had never advised me of

in all of our conversations. He never said, there's something that may blow up in my face, I've got to get my affairs taken care of before it happens. That would have been nice to have known.

. . . .

Q:     Can you explain to me how you believe the [*Fordu*] opinion was going to help [Plaintiff] preserve assets after Michele Nieswand had filed for divorce?

A:     Well, it was my thought that, given what [Plaintiff] had advised me, that there was co-mingling of funds, that they didn't have the wherewithal to continue the mortgage payments that there would be a substantial argument that the Uniform Fraudulent Conveyance Act would apply, and that even though there was a divorce decision that assigned various properties to the two people, the bankruptcy court would have a further and additional right to review that dispersion of properties and to modify them just as it did in Florida.

. . . .

And I thought we could say, if you're not going to cooperate with us in an appropriate fashion, there's certainly no reason for us to see you get the money rather than the creditors. And by appealing to the Trustee's interest in maximizing the recovery they would have been, "they" being – I guess I may have said plural instead of singular – [Plaintiff] would have been in a position to bring down the whole temple rather than just let his wife pursue her interests and press him for what he would get. It would be, obviously, very damaging to their mutual interests in coming out of this with as much in the family's interest as possible, but it would be a substantial issue to raise and say, you've got to be reasonable with us.

(Milne Dep. 32:1-25, 33:1-10, 33:21-25, 34:1-3, 34:1-25, 54:21-25, 55:1-9, 55:17-25, 56:1-7).

Prior to filing the petition, Milne had correspondence with Howard Sher, Michele's bankruptcy attorney, in regards to possibly or reaching an agreement prior to the bankruptcy filing:

Q:     Did you discuss resolving the matter of reaching an agreement prior to [Plaintiff] filing for bankruptcy with Michele Nieswand?

A:     Yes. That was the point of discussions with Mr. Sher, that they had problems too, and rather than find out the hard way who had the most problems we should come to resolution we could all live with.

Q:     And what was Michele Nieswand's response to you?

A:     They took a negative response, they wanted to press the issue.

Q:     And did Mr. Sher tell you that Michele would then cut a deal with the Trustee to take a lion's share or at least 66 percent of the real property held as tenants by the entirety between Michele and Blake?

. . . .
A: I don't believe prior to the bankruptcy there was any specific discussion of reaching an agreement with the Trustee.

Q: Okay. But, apparently, Michele Nieswand didn't feel compelled, at all, to reach any agreement with [Plaintiff] prior to him filing for bankruptcy?

. . . .
A: I believe Mr. Sher told me that they didn't care about the money, that her father was wealthy and they are interested in revenge.

Q: Knowing that Michele Nieswand would not enter into an agreement with [Plaintiff] prior to filing for bankruptcy, why did you advise [Plaintiff] to go through with the bankruptcy at that point?

A: It bought him time, it gave people the chance to calm down, it gave people the chance to consider things from an economic rather than an emotional point of view, it gave him the opportunity to work all the money to the Trustee and defeat the claim that all of this was marital assets rather than subject to business claim. It was the best of some hideously bad choices he had.

(Milne Dep. 35:15-25, 36:1-25, 37:1-2). Milne further opined that side agreements between the

Trustee and a non-bankruptcy-filing spouse were "rare and unusual." (*Id*. at 56:12).

On March 15, 2005, Milne filed the Chapter 7 petition. (Milne Dep. 17). Plaintiff paid a

flat fee of $1491.00 to Milne to prepare and to file the bankruptcy petition. (Nieswand Dep. 78).

By that time, some of Plaintiff's creditors had filed suit in state court, including a suit by

National City to collect the outstanding $490,000. (Def. Milne Br. Ex. G, Collection Suits). The

bankruptcy petition cover sheet provided Milne's home address, not that of CHG. (Milne Dep.

74). On March 31, 2005, a creditors' meeting was set for April 28, 2005.

On April 1, 2005, Gordinier wrote another letter to Robbins, outlining Plaintiff's

proposed global resolution:

At this time, my client has submitted to me a simple proposal based upon the limited assets that the parties have, the same which we could use as a structure towards moving forward regarding the preparation of an ultimate judgment of divorce in this matter, while at the same time allowing the completion of the bankruptcy proceedings.
. . . .

It would be my client's understanding that he would retain the Sunplace property with an approximate equitable value of Three Hundred Fifty ($350,000) Dollars and the Chateaux property would be sold on a 1031 Exchange basis with all proceeds to be used by your client to purchase a new home in the Michigan area with the approximately Three Hundred Fifty ($350,000) Dollar Price.

The Bayshore property would also be sold and that the overall estate would be divided on a Fifty Five (55%) percent basis equity to Plaintiff and Forty Five (45%) percent basis to Defendant. As a result, it would be the intention of my client that from the Three Hundred Thousand ($300,000) Dollar proceeds from Bayshore and Blueridge that your client would retain Two Hundred Thousand ($200,000) Dollars of the same and my client retain One Hundred Thousand ($100,000) Dollars to adjust for the percentage of the distribution as stated above.
. . . .
It is this writer's understanding that this proposal for settlement, inclusive of the unequitable division of the marital estate is based upon the anticipated cooperation either by the dismissal of the Complaint in this matter, with an expectation of reinstatement, or the withholding of a Judgment until after the completion of my client's personal bankruptcy.

Again, the decision as to whether to dismiss or simply withhold the Judgment would be made by Mr. Milne, bankruptcy counsel on behalf of my client.

(Def. Milne Br. Ex. I-2, Letter).

On April 15, 2005, Milne, Gordinier, Robbins, and Sher had a meeting to discuss possible resolutions of the divorce and bankruptcy cases. (Gordinier Dep. 22). Gordinier submitted his proposal that would give 55% of the marital estate to Michele. (*Id*. at 21-22). Michele rejected this proposal, and instead counter-proposed to pay Plaintiff a flat amount of $150,000 plus her cooperation in the bankruptcy case. Sher further indicated that if Plaintiff did not accept this proposal, Sher would negotiate a distribution of the entireties properties with the Trustee, leaving Plaintiff only with his exempt assets after exiting bankruptcy. Towards the end of the meeting, Milne indicated that he had to leave, and then left. (*Id*. at 23).

Gordinier testified that the following occurred right after the April 15 meeting:

A: I then received a phone call from [Milne], is my recollection, and I don't know if it was while we were still on the road or later in the day or the next day, but nonetheless, he called me and articulated the fact that we needed to stick together, him and I, in this process – it must have been the same day, and that I told him, look, in light of what I am hearing, we're not sticking together at all. You need to do your job and step up here because I've got to let [Plaintiff] know what I just heard. And I immediately, as you can tell, on April 15, ran back here and drafted this correspondence in light of what I thought was the seriousness of what we were dealing with.

. . . .

A: I believe suddenly, and I use the term suddenly, the shift on Mr. Milne's position was we need to dismiss this bankruptcy. And then, if I recall, there was some discussions about convincing Mr. Robbins and Mr. Sher to go back to our global proposal that I previously submitted and just dismiss the bankruptcy.

(*Id.* at 24:17-25, 26:12-19)

At some point after the April 15 meeting, Milne decided to withdraw from his representation of Plaintiff in the bankruptcy proceedings. (Milne Dep. 46).

On April 21, 2005, Plaintiff faxed to Milne a request to terminate the bankruptcy filing, since Plaintiff believed at the time that he could work things out with his largest creditor, National City. (Nieswand Dep. 84-85; Def. Milne Br. Ex. J, 4/21/05 Email). Plaintiff testified that the rest of his debt at that time "was just credit card debt that could be worked out through normal arbitration." (Nieswand Dep. 85). Plaintiff testified to the following about the dismissal:

Q: Did [Milne] at any time tell you that he would file some kind of motion to get the case dismissed?
A: No.
Q: Did he tell you that he would get the case dismissed?
A: He said that there's a possibility that it would be dismissed by not showing up.
Q: Not showing up for that initial meeting?
A: That's right.
Q: And so did you decline to appear then for your initial meeting?
A: I couldn't even afford to come up [to Michigan], but yes, I declined to come, to not go.

(*Id*. at 87:14-25).

On April 25, 2005, Milne took an attorney position at the law firm of Trott & Trott, a firm that performs extensive work on behalf of creditors. (Milne Dep. 18). Milne notified Plaintiff that he would be withdrawing as his attorney, and would be cooperating with Plaintiff's new counsel, Arnold Schafer and Kenneth Beams. (*Id*. at 47).

On April 27, 2005, Milne contacted the Trustee to advise the latter that Plaintiff and Milne were not going to attend the scheduled examination. On April 28, 2005, the date of the scheduled creditors' meeting, neither Plaintiff nor Milne appeared. Plaintiff's bankruptcy case was not dismissed.

On May 17, 2005, Scott Dales from National City wrote a letter to Milne (at Milne's former CHG address), informing Milne of the following: (1) the bank was rejecting Plaintiff's $22,000 offer on the outstanding debt; (2) the bank counter-proposed an amount of $75,000 (with the understanding that Plaintiff would be entitled to a possible homestead exemption); and (3) stating that the bank would not oppose Plaintiff's potential motion to dismiss the bankruptcy. (Pl. Br. Ex. 4, Letter).

On May 20, 2005, the Trustee filed a motion to compel Plaintiff's examination and for sanctions in the amount of $500.00.

On June 2, 2005, the Trustee filed objections to some of Plaintiff's claimed exemptions, most notably the real estate properties. In the motion, the Trustee indicated that the he had reached a tentative settlement agreement with Michele.

Plaintiff testified that Beams suggested either trying to dismiss the bankruptcy, or to convert the Chapter 7 case into a Chapter 11 case. (Nieswand Dep. 97-98).

On June 9, 2005, the Trustee filed a motion for authority to compromise the bankruptcy trustee's claims with respect to property of the bankruptcy estate subject to the marital estate claims of Michele. The proposed agreement between the Trustee and Michele dissolved the entireties properties before the end of the 180-day period that would have allowed Plaintiff to take his share of the marital assets exempt from the creditors' claims. Before the motion was filed, Plaintiff testified that he sent Michele an e-mail, promising to give her more than she would get through her deal with the Trustee – to which Michele responded, "Screw you." (*Id*. at 57).

On June 9, 2005, Schafer and Beams formally substituted as counsel for Milne. On June 17, 2005, Plaintiff filed Amendments to his bankruptcy schedules.

On June 20, 2005, Plaintiff responded to the Trustee's objections, arguing primarily that the settlement agreement between the Trustee and Michele impermissibly permitted the Trustee to administer exempt assets. On June 30, 2005, Plaintiff filed two motions: (1) a motion to convert his Chapter 7 case into a Chapter 11 case; and (2) objections to the Trustee's motion to compromise the bankruptcy estate.

On July 8, 2005, National City responded to Plaintiff's motion to convert, contending that: (1) Plaintiff's true motivation in seeking to convert was to avoid the Trustee settlement agreement; (2) under Chapter 11, Plaintiff could use more of the estate's assets in his divorce proceedings; and (3) the bank did not believe that Plaintiff could complete a Chapter 11 plan. On July 20, 2005, Michele filed a response to Plaintiff's motions, urging the bankruptcy court to accept the settlement agreement. On July 21, 2005, the Trustee also filed a motion resisting the conversion.

On July 22, 2005, Plaintiff filed a brief in support of his motion to convert to Chapter 11, contending: (1) the Chapter 11 would produce more assets for the creditors; (2) Plaintiff was attempting to convert in good faith; and (3) the Trustee was not permitted to administer exempt assets. (Def. Br. Milne Ex. N, 7/22/05 Brief).

On July 25, 2005, the bankruptcy judge held a hearing on the pending motions and granted the Trustee's motion to compromise the bankruptcy estate. On July 29, 2005, the bankruptcy judge also denied Plaintiff's motion to convert.

Under the settlement agreement, the Trustee sold the Florida properties for $1.4 million, which resulted in a distribution of $558,985 to Michele and $334,885 to the Trustee. Plaintiff received his $30,000 exemption.

On July 19, 2006, attorney Thomas J. Budzynski filed a motion of abandonment of a potential malpractice claim to the debtor. (Def. CHG Br. Ex. 15, Motion). After holding a hearing, the bankruptcy court granted the motion, permitting Plaintiff to pursue the instant claims in this Court.

On August 23, 2006, the bankruptcy court ordered that Plaintiff pay that $30,000 to Michele to satisfy his then-outstanding domestic support obligations. (Nieswand Dep. 48-49).

On February 5, 2007, Plaintiff filed the instant Complaint, asserting Counts of legal malpractice against both Milne and CHG. Plaintiff's claims that Milne committed legal malpractice by: (1) advising him to file Chapter 7 bankruptcy in Michigan during the divorce proceedings; and (2) filing a Chapter 7 bankruptcy, rather than Chapter 11. Plaintiff's central hypothesis is that the state court divorce proceedings might have resulted in his acquiring one of the Florida properties, which he could then exempt in the potential Florida bankruptcy action.

Plaintiff alleges that if he had been advised correctly, he could have walked away from the divorce and bankruptcy proceedings with the $463,500.00 in equity from the Florida property, plus his debts discharged – instead of virtually nothing.

During the summer of 2007, Plaintiff married Jill Fox, the aforementioned Florida waitress. (Nieswand Dep. 4).

As of the date of the instant Order, Plaintiff's bankruptcy case is still pending.

In the instant case, both Defendants have moved for summary judgment.

## II.    ANALYSIS

### A.    Standard for Summary Judgment

The United States Court of Appeals for the Sixth Circuit has summarized the relevant legal standard for a summary judgment motion:

> Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing a motion for summary judgment, we view the evidence, all facts, and any inferences in the light most favorable to the nonmoving party. "To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact." A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."

*Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 500-01 (6th Cir. 2007) (internal citations omitted).

### B.    Claims against Milne

The crux of Plaintiff's argument is that, given the circumstances, Milne did not act in good faith, nor exercised reasonable care, skill, and diligence in recommending that Plaintiff file

Chapter 7 bankruptcy. Plaintiff admits that Milne's strategy may have worked if Michele had agreed to stay out of the bankruptcy proceedings, or if the bankruptcy judge had not approved the settlement agreement. Plaintiff contends that Milne should have accounted for the possibility that given that Plaintiff's only significant assets were tied up in entireties properties, the Trustee and Michele would both have a mutual incentive to dissolve the entireties. In that scenario, Michele would be able obtain a larger share of the marital assets in the bankruptcy proceeding than in the divorce proceedings; and the Trustee could gain a sizeable amount to distribute to creditors, instead of virtually nothing if the entireties properties remained intact. Per the argument, when Milne learned, pre-bankruptcy filing, that Michele may not cooperate, he should have refrained from filing bankruptcy and instead advised Plaintiff to proceed with the divorce. Plaintiff points that after the April 15, 2005 meeting – where Michele gave Plaintiff the option of either $150,000, or otherwise colluding with the Trustee – Milne realized that the bankruptcy case needed to be dismissed to protect Plaintiff. However, the Trustee did not agree to dismiss the case.

Plaintiff further proposes that Milne should have encouraged Plaintiff first to establish a homestead at one of the Florida properties that he may have ultimately received in the divorce proceedings, and then second to file bankruptcy in Florida.[1] By filing bankruptcy in Florida, Plaintiff would have been theoretically able to exempt that valuable property from his creditors.

Plaintiff's Florida proposal admittedly assumes that the following events would have occurred: (1) that the state court would have given him, over Michele's potential objection, the

---

[1]     Plaintiff guesses that the divorce would have resulted in Plaintiff specifically receiving the Sunplace Florida property, worth approximately $463,000.

most valuable of Florida properties outright; (2) Plaintiff's creditors would not have filed judgment liens on his divorce distribution; (3) that Plaintiff could have established a homestead in the Florida property within the six-month period under the pre-2005-amendment BAPCPA; (4) that Plaintiff would then file bankruptcy in Florida, whereby his substantial homestead property would be exempt from his creditors; and (5) the Florida bankruptcy court would not consider his transfer assets to the Florida homestead as an attempt to avoid paying his creditors. Per Plaintiff, if he had homesteaded a Florida property, he would have come out with approximately $463,000 in assets after a potential Florida bankruptcy proceeding.[2] Plaintiff

---

[2] Plaintiff attaches an affidavit from Gordinier, stating that the state court divorce action would have resulted in Plaintiff receiving one of the Florida properties, worth approximately $463,500.00. (Pl. Br. Ex. 4, Gordinier Aff. ¶ 10). At his deposition, Gordinier testified that he believed that the state court would have provided a 55% / 45% asset distribution in favor of Michele. The couple owned four pieces of property at the time of the divorce filing: (1) Marital Home (Michigan) worth $567,000 with $67,000 in equity; (2) Sunplace (Florida) worth $463,500, with $463,500 in equity; (3) 19451 Gulf (Florida) worth $314,000 with $194,585.85 in equity; and (4) 19530 Gulf (Florida) worth $627,000 with $317,000 in equity. Under Gordinier's scenario, the state court judge would have awarded Plaintiff the Sunplace property (the most valuable individual piece of property in terms of equity), while saddling Michele with the other three (with their approximate $900,000 combined debt) with no means to make the payments. However, when asked directly, Gordinier could not specify which property, if any, Plaintiff would have received in the divorce proceedings.

On March 23, 2008, Milne filed a motion to strike Gordinier's affidavit from the summary judgment consideration, contending that Plaintiff failed to disclose his opinions as an expert under Fed. R. Civ. P. 26. Plaintiff responds that Gordinier is exempt from Rule 26's requirement because he was not "retained or specially employed to provide expert testimony." Both parties analogize Gordinier's opinion to the "treating physician" rule – where Milne contends that Gordinier formed these opinions for the purpose of the instant litigation (thus requiring an expert report), and Plaintiff takes the position that Gordinier formed these opinions during the course of his representation of Plaintiff.

Even if his opinions are properly admissible, their substance lacks any thoughtful explanation or analysis – and otherwise appear "carefully tailored to support plaintiff's position but devoid of analysis." *Minasian v. Standard Chartered Bank*, 109 F.3d 1212, 1216 (7th Cir. 1997). During the underlying divorce case, Gordinier had proposed to Michele that Plaintiff retain the Sunplace property as part of a global settlement, but Michele rejected that offer. Furthermore, Gordinier fails to explain, as part of a theoretical 55/45 distribution, why the state

submits the post-filing letter from National City, offering to settle the largest debt for $75,000. In the alternative, Plaintiff maintains that he should have filed Chapter 11 bankruptcy.

Milne responds that given Plaintiff's dire economic circumstances at the time of the bankruptcy filing, his strategy of filing Chapter 7 bankruptcy provided Plaintiff his best shot at emerging from the divorce and bankruptcy with a maximum amount of assets. Milne testified that his main concern was protecting Plaintiff from his aggressive creditors, some of whom had received judgments and could have filed liens on Plaintiff's potential divorce resolution. According to Milne's plan, since Plaintiff's substantial entireties properties would be exempt from his creditors in bankruptcy, he could emerge with his debts discharged – and then work out the dissolution and division of the entireties properties through the divorce proceedings.[3] Under that scenario, the divorce judgment most likely would have given him 45% of the value of other properties.

Milne admitted that this plan relied, at least in part, on Michele's cooperation. According to Milne, Plaintiff did not inform him at the time that Plaintiff had cheated on his wife. Finally, Milne suggests that when the Trustee brought the motion to compromise the estate, it was debatable whether the bankruptcy judge should have granted the motion – rather than abstaining from intervening in marital property disputes during pending state court divorce proceedings.

_____

court judge would have awarded the most valuable (and mortgage-free) property to the party at-fault in the divorce.

[3]     Milne suggests that this approximate strategy has subsequently "worked" in at least one subsequent bankruptcy. In *In re Davis*, 356 B.R. 385 (Bankr. W.D. Pa. 2006), the Chapter 7 trustee filed objections to a debtor claiming that his entireties properties was exempt, even though concurrent divorce proceedings were ongoing. The bankruptcy judge ruled that: (1) since a divorce decree had not been entered, the debtor could properly exempt the entireties property; and (2) the subsequent dissolution of the entireties property did not affect the debtor's exemption. *Id*. at 387-88.

The Michigan Supreme Court has provided the standards for evaluating a claim of attorney malpractice:

In order to state an action for legal malpractice, the plaintiff has the burden of adequately alleging the following elements:

    (1)      the existence of an attorney-client relationship;
    (2)      negligence in the legal representation of the plaintiff;
    (3)      that the negligence was a proximate cause of an injury; and
    (4)      the fact and extent of the injury alleged.

. . . .

It is well established that "[a]n attorney is obligated to use reasonable skill, care, discretion and judgment in representing a client." Further, according to SJI2d 30.01, all attorneys have a duty to behave as would an attorney "of ordinary learning, judgment or skill . . . . under the same or similar circumstances. . . ."

An attorney has the duty to fashion such a strategy so that it is consistent with prevailing Michigan law. However, an attorney does not have a duty to insure or guarantee the most favorable outcome possible. An attorney is never bound to exercise extraordinary diligence, or act beyond the knowledge, skill, and ability ordinarily possessed by members of the legal profession.

In *Babbitt*, this Court held that

[a] lawyer is not an insurer of the result in a case in which he is employed, unless he makes a special contract to that effect, and for that purpose. Neither is there any implied contract, when he is employed in a case, or any matter of legal business, that he will bring to bear learning, skill, or ability beyond that of the average of his profession.

. . . .

In *Denzer v. Rouse*, the court noted that an attorney cannot possibly be required to predict infallibly how a court will rule. "A lawyer would need a crystal ball, along with his library, to be able to guarantee that no judge, anytime, anywhere, would disagree with his judgment or evaluation of a situation." Similarly, this Court refuses to impose any greater duty on attorneys than to act as would an attorney of ordinary learning, judgment, or skill under the same or similar circumstances.

Lastly, mere errors in judgment by a lawyer are generally not grounds for a malpractice action where the attorney acts in good faith and exercises reasonable care, skill, and diligence. Where an attorney acts in good faith and in honest belief that his acts and omissions are well founded in law and are in the best interest of his client, he is not answerable for mere errors in judgment.

> [T]here can be no liability for acts and omissions by an attorney in the conduct of litigation which are based on an honest exercise of professional judgment. This is a sound rule. Otherwise every losing litigant would be able to sue his attorney if he could find another attorney who was willing to second guess the decisions of the first attorney with the advantage of hindsight. . . . To hold that an attorney may not be held liable for the choice of trial tactics and the conduct of a case based on professional judgment is not to say, however, that an attorney may not be held liable for any of his actions in relation to a trial. He is still bound to exercise a reasonable degree of skill and care in all his professional undertakings.

*Simko v. Blake*, 448 Mich. 648, 655-59 (1995) (internal citations omitted).

Milne contends that his advice constituted reasonable professional judgment. At the outset, Milne assessed the situation as a "lose-lose" for Plaintiff, and attempted to fashion a strategy that would maximize Plaintiff's assets, given the pending divorce action and the various creditor actions pending in state court. Milne's tactics were based on an assumption that either Michele could be persuaded to dismiss the divorce action, or that the divorce judgment would be entered within 180 days of filing the bankruptcy petition – in either instance the couple's Michigan and Florida properties, their primary assets, would be safeguarded from creditors. Once the bankruptcy was concluded, per Milne, the divorce proceedings could continue, where the distribution of the entireties properties would likely be 55% to 45% in favor of Michele.

Plaintiff retained Budzynski – the same attorney who argued the abandonment motion – as an expert witness to testify to the appropriate standard of care. Initially, Budzynski admits that Milne's strategy would have worked if any of the following events would have happened: (1) Michele agreed to dismiss the divorce proceedings (or otherwise the 180-day-rule was invoked); or (2) the bankruptcy judge decided to abstain from intervening in marital property distribution issue then pending in a concurrent state court action. However, Budzynski opined that although

he himself had used Milne's strategy in the past, Milne should not have filed bankruptcy unless he knew that Michele would cooperate. (Budzynski Dep. 39). Furthermore, given the amount of Plaintiff's real estate assets – versus his substantial debts – Budzynski maintains that the Trustee would more closely examine Plaintiff's situation.

The Court finds that the record demonstrates that Milne's advice to file bankruptcy was a tactical decision grounded in a good faith belief that the strategy would benefit his client. Milne's primary goal was to protect Plaintiff from his creditors. Milne had no control over the initiation or pace of the divorce proceedings. At the time of filing, Plaintiff owed more than $600,000 in unsecured debt,[4] which far exceeded his speculated 45% share of the marital assets, approximately $490,000.[5] If Plaintiff did not file bankruptcy, his creditors, some of whom had already filed state court actions and received judgments, could have put liens on his expected distribution of the marital property at the end of the divorce proceedings. Milne supposed that if Plaintiff filed Chapter 7 bankruptcy, he could protect the entireties properties for his benefit (and for Michele), if either Michele would dismiss the divorce proceedings, or the divorce judgment could be entered within 180 days of bankruptcy filing. Additionally, there is no indication that National City would have agreed to settle Plaintiff's debt for $75,000 if no bankruptcy petition had been filed.

Milne's plan was ultimately derailed by Michele's appearance in the bankruptcy proceeding and her subsequent collusion with the Trustee to dissolve the entireties. Although

---

[4] The $600,000 amount was comprised of creditors that submitted proofs of claim in the bankruptcy case, and were not a joint obligation with Plaintiff's business debts.

[5] On October 20, 2007, Plaintiff amended his interrogatory answers, stating that he "personally" owed somewhere between 20% and 40% of the listed credit card debt. Even under this view, Plaintiff's unsecured debts would still have exceeded his expected 45% of the marital estate.

Milne was aware of Michele's unwillingness to cooperate shortly before the petition was filed, Milne concluded that filing for bankruptcy may give the parties a chance to calm down and to reconsider their positions. It was not until the April 15, 2005 meeting of attorneys that Milne discovered that Michele would flatly reject a compromise at that time, and would make a side agreement with the Trustee. Given Michele's stance, Milne figured that Plaintiff had two alternatives: (1) to attempt to dismiss the bankruptcy petition; or (2) to convince the bankruptcy judge not to approve such a settlement agreement. In fact, subsequent counsel attempted both, ultimately unsuccessfully.

Although Milne withdrew as counsel around this time, it was certainly not assured that the bankruptcy judge would subsequently sign off on the deal. In fact, Plaintiff's subsequent counsel vigorously objected to the proposed arrangement – arguing in part that the bankruptcy court should: (1) abstain from intervening in the dissolution of marital property while a divorce proceeding was occurring; and (2) reject the Trustee's attempts to administer exempt assets (the entireties properties) through the settlement agreement. Although Plaintiff received adverse ruling on both of these arguments, both contentions had legal merit. Plaintiff's counsel did not file an appeal. Under the law of legal malpractice, Milne is not required to have a "crystal ball" and "to guarantee that no judge, anytime, anywhere, would disagree with his judgment or evaluation of a situation." The bankruptcy judge could have justifiably rejected the settlement agreement, which would have preserved Milne's original strategy.[6]

Hindsight appears to be Budzynski's strategy's greatest asset. Although Milne maintains

---

[6] Budzynski additionally contends that with some "pre-bankruptcy" planning, Milne could have retained perhaps $50,000 – $80,000 of his assets. He does not specify what exactly Milne could have done to obtain that goal.

that Plaintiff would have had to taken a number of steps to homestead a Florida property, it would have been certainly possible. However, at the same time, Budzynski's plan also includes a number of similar risks. First, Michele would have had to have cooperated, or at least assented, to the state court's grant of a valuable piece of Florida property exclusively to Plaintiff. Secondly, even if Plaintiff could have established the six-month Florida residency requirement in time to file bankruptcy in Florida before the 2005 BAPCPA amendments took effect (October 17, 2005), the bankruptcy court in Florida may have concluded the Plaintiff was transferring his assets to a Florida homestead in order to avoid paying his creditors, and therefore deny his request for a discharge. Finally, Budzynski's strategy also fails to account for the real possibility that Plaintiff's creditors would have attached liens to his state court divorce distributions – a difficult proposition for Plaintiff since the creditors' claims were greater than Plaintiff's expected 45% distribution.

Michigan law is clear that attorneys are not required to have special clairvoyance, nor act as the guarantors of judgments for their clients. Both strategies carried their share of risks and speculated rewards – and Plaintiff has not shown that Milne's advice was not grounded in good faith belief and legal argument, nor reflected reasonable care, skill, and diligence. Milne's strategy first concentrated on discharging Plaintiff's $600,000 debts, then preserving the entireties properties through the bankruptcy, and finally distributing the marital assets through the divorce proceedings. Plaintiff's hypothesis relies upon both a speculated possibility of collusion, the benefit of hindsight, and the ultimate decision of the bankruptcy judge, whose rulings Milne cannot be required to guarantee for his client. Plaintiff's argument implicates Milne's "tactical decision" and, at the very most, may demonstrate a "mere error in judgment;"

but does not impugn Milne's good faith belief or reasonable efforts on behalf of Plaintiff. *See Simko*, 448 Mich. at 658, 660.

In the alternative, Plaintiff asserts that Milne should have filed a Chapter 11 petition instead. Milne responds that Plaintiff did not have a viable Chapter 11 case. Milne maintains that Plaintiff was not in a position to maintain a Chapter 11 plan for the following reasons: (1) Plaintiff had no property or disposable income to fund a Chapter 11 plan, given the fact that he could not even maintain the $4,000 per month status quo support payments; and (2) Plaintiff would not have been able to obtain debtor-in-possession financing since he had no income or collateral.

Plaintiff's evidence on this point consists of conclusory speculations that Plaintiff could have maintained a Chapter 11 case, if he were able to obtain financing. Budzynski opined that he was not sure whether filing Chapter 11 would have satisfied the standard of care, or whether Plaintiff had enough assets to fund such a plan. *See Tanner v. Caplin & Drysdale*, 24 F.3d 874, 878-79 (6th Cir. 1994) (applying Tennessee law) (holding that speculation about what might have occurred if a client had not followed an attorney's advice does not create a fact question on damages).

Therefore, the Court GRANTS summary judgment to Milne.

**C.    Claims against Cox, Hodgman & Giamarco P.C.**

Since the Court has found that Milne is entitled to summary judgment on the attorney malpractice claim, it follows the CHG is likewise entitled to summary judgment.[7]

---

[7]    CHG contends that it is entitled to summary judgment because: (1) Plaintiff cannot show that Milne was an employee or agent at the time of the malpractice; and (2) Plaintiff's malpractice claim is the property of the bankruptcy estate, since it was not abandoned by the Trustee.

## III.    CONCLUSION

For the foregoing reasons, the Court hereby:

(1)    **GRANTS** Milne's Motion for Summary Judgment (Doc. No. 27);

(2)    **GRANTS** CHG's Motion for Summary Judgment (Doc. No. 29);

_____

CHG argues that at the time of the bankruptcy filing on March 15, 2005, Milne was neither an employee nor an agent of CHG. CHG relies upon the following: (1) Plaintiff formally ceased his employment with the firm on November 1, 2004; (2) Plaintiff took steps to open his own client trust fund accounts by February 2005; (3) Plaintiff physically moved out of the law firm's facilities on March 11, 2005; and (4) Plaintiff acknowledged in a letter the fact that Milne was leaving the firm.

Plaintiff points to the following to support the argument that CHG had actual or apparent authority over Milne: (1) another employee of CHG introduced Milne to Plaintiff; (2) CHG permitted Milne to use its phones and office; (3) Milne was kept up on CHG's website until April 2005; and (4) CHG forwarded Plaintiff's $1,700 check to Milne's personal client trust fund account.

"In order to prove that a defendant employer is vicariously liable for its employee's negligent acts, the plaintiff need only show that there was an employment relationship between the employer and the employee and the negligence occurred within the scope of the employment." *Rogers v. JB Hunt Transport, Inc,* 244 Mich. App 600, 605 (2001). In cases involving legal malpractice claims against individual attorneys as well as their former law firms, the Michigan courts look to: (1) whether the attorney was still actually employed with the firm when the malpractice occurred; and (2) whether the client was aware that the attorney had ceased his or her association with the firm. *See Estate of Mitchell v. Dougherty*, 249 Mich. App. 668, 685-86 (2002); *Stawarz v. Fresard*, No. 234542, 2003 WL 356661, *2-3 (Mich. Ct. App. Feb. 14, 2003) (unpublished) (holding that where the plaintiff visited the attorney at his new office, exchanged correspondence at the new address, and did not rely upon the attorney's former firm for any services, the plaintiff could not hold the former law firm liable).

In the instant case, by the time the bankruptcy petition was filed, Milne had left his firm, and clearly communicated that fact to Plaintiff. Plaintiff signed a letter indicating that he understood that he was continuing to retain Milne, and not his former law firm. Despite the fact that Milne was working out of CHG's offices and was listed on CHG's website until June 2005, Plaintiff understood that Milne had left the firm and was acting as his attorney for the bankruptcy proceedings as a solo practitioner. On these facts, there is no basis to hold CHG vicariously liable for Milne's alleged acts.

(3)      **DENIES** Plaintiff's Motion for Summary Judgment (Doc. No. 31); and

(4)      **DENIES AS MOOT** Milne's Motion to Strike (Doc. No. 38).

**SO ORDERED.**


                      s/Paul D. Borman
                      PAUL D. BORMAN
                      UNITED STATES DISTRICT JUDGE

Dated:  May 30, 2008

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on May 30, 2008.


                      s/Denise Goodine
                      Case Manager

.